**FILED**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

2013 FEB -5  P 2: 54

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

---

**MUHAMMAD AMIR,**
504 M Street, N.W., #1
Washington, DC 20001, and

**SOLOMAN ASSEFA,**
11818 Tregiovo Place
Fort Washington, MD 20744, and

**ISHAKU E. ATAM,**
6460 Greenfield Road, #205
Elkridge, MD 21075, and

**DANIEL F. BERHANE,**
9200 Pebble Court
Fort Washington, MD 20744, and

**GOITOM BISRAT,**
439 N. Armistead Street #12
Alexandria, VA 22312, and

**SYED S. BUKHARI,**
5550 Columbia Pike #172
Arlington, VA 22204, and

**MUHAMMAD M. CHOUDHRY,**
4300 Columbia Pike, Apt 27
Arlington, VA 22204, and

**TARIQ FAROOQ,**
9529 Shepherd Hills Drive
Lorton, VA 22079, and

**BABAR A. KHAN,**
13929 Rockland Village Drive #104
Chantilly, VA 20151, and

Case No. 1:13 CV 161
CMH / TCB

**QAZI N. KHAWAR,**                    *
2927 Seminole Road                      *
Woodbridge, VA 22192, and               *
                                        *
**INAM-UL KUSHWAHA,**                  *
20720 Bounty Field Place                *
Gaithersburg, MD 20886, and             *
                                        *
**AHMADULLAH MOJADIDI,**              *
5341 Chandley Farm Circle               *
Centerville, VA 20120,  and             *
                                        *
**AAMIR F. QAZI,**                     *
712 Young Way                           *
Westminster, MD 21158, and              *
                                        *
**HAMID SAEED,**                       *
6121 Rocky Way Court                     *
Centreville, VA 20120, and              *
                                        *
**ENDALE TEREDA,**                     *
5253 Dunstable Lane                     *
Alexandria, VA  22315, and              *
                                        *
**CARLOS I. TOSEAFA,**                 *
9205 Livery Lane, Apt A                 *
Laurel, MD  20723, and                  *
                                        *
**SHEHZAD YOUSAF,**                    *
13935 Rockland Village Drive, #303      *
Chantilly, VA 20151,                    *
                                        *
    *On Behalf of Themselves and*      *
    *All Others Similarly Situated,*   *
                                        *
       PLAINTIFFS,     *
                                        *
   v.                              *
                                        *
**SUNNY'S COACH SERVICES, INC.,**      *
   d/b/a Sunny's Coach Service, Inc.,  *

Sunny's Executive Sedan Service, Inc.,          *
Sunny's Executive Sedan & Limo                  *
Service, Inc., and                              *
Sunny's Worldwide Chauffeured                   *
Transportation,                                 *
23765 Pebble Run Place, Suite 100               *
Sterling, Virginia 20166,                       *
                                                *
Serve:  Shafqat Chaudry                         *
23765 Pebble Run Place, Suite 100               *
Sterling, Virginia 20166,                       *
                                                *
          AND                                   *
                                                *
**SHAFQAT CHAUDRY,**                            *
835 Seneca Drive                                *
Great Falls, Virginia 22066                     *
                                                *
          DEFENDANTS.                           *
                                                *

## COLLECTIVE ACTION COMPLAINT

1.      Plaintiffs Muhammad Amir, Soloman Assefa, Ishaku E. Atam, Daniel F.

Berhane, Goitom Bisrat, Syed S. Bukhari, Muhammad M. Choudhry, Tariq Farooq,

Babar A. Khan, Qazi N. Khawar, Inam-Ul Kushwaha Ahmadullah Mojadidi, Aamir F.

Qazi, Hamid Saeed, Endale Tereda, Carlos I. Toseafa, and Shehzad Yousaf

("Plaintiffs"), by and through their undersigned counsel, on behalf of themselves and

all others similarly situated, hereby submit their Collective Action Complaint against

Defendants Sunny's Coach Services, Inc., d/b/a Sunny's Coach Service, Inc., and

Sunny's Executive Sedan Service, Inc., and Sunny's Executive Sedan & Limo Service,

Inc., and Sunny's Worldwide Chauffeured and Shafqat Chaudry, aka "Sunny"

(collectively "Defendants"), to recover unpaid wages, liquidated damages, reasonable attorney's fees and costs under section 16(b) of the Federal Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201 *et seq.* (hereinafter "FLSA") and damages for fraud, conspiracy, breach of contract and unjust enrichment under Virginia common law.

## INTRODUCTION

2.      The Fair Labor Standards Act ("FLSA") requires that employers pay their employees at least the minimum wage for all hours worked, and time-and-a-half their regular rate of pay for all hours worked in excess of 40 in any work week. An employer may not avoid these legal obligations by simply labeling its workers as "independent contractors" if the employer in fact treats the workers as employees. Nor may any company lawfully unjustly enrich itself, at the expense of those performing service for it, by requiring employees to pay the company's operating expenses, like the vehicle costs incurred in performance of transportation services, without full repayment of those costs, or by retaining fuel surcharges paid by its customers to defray fuel costs that the company itself pays nothing for, but instead requires the drivers it employs to purchase, or by stealing gratuities that the company collects from customers after telling the customers that gratuities routinely assessed are given to customers' drivers.

3.      Yet that is precisely what Defendants have done here. Until November 2011, Defendants knowingly and deliberately misclassified the chauffeurs they employed, while using fear and intimidation to deliberately deprive numerous drivers of benefits they would

4

have and should have enjoyed as employees, while allowing Defendants to cheat on taxes

they properly owed and should have paid, thereby competing unfairly against law-abiding

competitors. After November 2011, while continuing to use fear and intimidation,

Defendants have deprive numerous drivers of benefits owed them under federal and state

law, now as employees.

## PARTIES AND JURISDICTION

4.      Plaintiffs are adult residents of the States of Virginia and Maryland, and

the District of Columbia. Consents to participate as plaintiffs in a collective action

under the FLSA and identifying each person's approximate dates of employment (as a

driver) with and by Defendants are attached hereto as **Exhibit 1**.

5.      Upon information and belief, Sunny's Coach Services, Inc. is a

corporation formed under the laws of the State of Virginia on or about October 12,

2001, with its principal place of business in Sterling, Virginia. At all times relevant,

Sunny's Coach Services Inc. was Plaintiffs' "employer" for purposes of the FLSA and

all other claims made herein.

6.      Upon information and belief, Shafqat Chaudry is the President, primary

owner, and in charge of the day-to-day operations of Sunny's Coach Services, Inc. At

all times relevant to this action, Chaudry was Plaintiffs' supervisor and made all

decisions relating to Plaintiffs' rate and method of pay. At all times relevant, Chaudry

was Plaintiff's "employer" for purposes of the FLSA and all other claims made herein.

7.      At all times relevant, Defendants were engaged in commerce or in the

production of goods for commerce within the meaning of § 3(s)(1) of the FLSA (29 U.S.C. § 203(s)(1)).

8.    At all times relevant, Defendants qualified as an "enterprise" within the meaning of § 3(r) of the FLSA (29 U.S.C. § 203(r)).

9.    At all times relevant, Plaintiffs were individual employees engaged in commerce or the production of goods for commerce as required by 29 U.S.C. §§ 206-207.

10.    This Court has jurisdiction over Defendants pursuant to § 16(b) of the FLSA, 29 U.S.C. § 216(b), and 28 U.S.C. §§ 1331 and 1337 relating to "any civil action or proceeding arising under any Act of Congress regulating commerce." This Court has supplemental jurisdiction over the related common law claims pursuant to 28 U.S.C. § 1367(a). Plaintiffs' state common law claims are closely related to Plaintiffs' federal claim, as all of Plaintiffs' claims share common operative facts. Resolving all federal and state claims in a single action serves the interests of judicial economy, convenience and fairness to the parties. Venue is proper pursuant to 28 U.S.C. § 1391(b).

## PLAINTIFFS WERE AT ALL TIMES EMPLOYEES

11.    Prior to November 2011, Defendants had created and required Plaintiffs and other drivers to sign or otherwise appear to agree to an "Independent Contract Agreement" ("ICA") that purported to provide the drivers with the potential to realize gain or loss through each driver's own efforts using vehicles leased from

Defendants.  In fact, at all times throughout Plaintiffs' employment with Defendants, Plaintiffs and all other similarly situated drivers were employees of Defendants and were never independent contractors.  The ICA functioned and was intended by Defendants to function as "window dressing" while facilitating Defendants' scheme to underpay its employees and to avoid other legal obligations employers must comply with, including payment of various tax and social security obligations and worker's compensation insurance.

12.   Defendants' ICA was in effect until November 2011.  Under the initial ICA that Defendants appeared to issue to Plaintiffs and the other drivers they employed, but which Defendants deliberately refused to date, each driver was told that he was a "CONTRACTOR . . . a self-employed professional chauffeur for tax purposes."  As a result of this purported "non-employee" relationship, Defendants told Plaintiffs and other similarly situated drivers that Defendants were not responsible for "withholding taxes, F.I.C.A. taxes, highway use taxes, unemployment compensation taxes, worker's compensation insurance, or any other taxes or obligations."  Upon information and belief, Defendants failed to comply with any of these legally mandated employer obligations.  As a result of Defendants' deliberate and improper misclassification scheme, drivers were not provided with credit towards social security, drivers injured on the job were not provided with any worker's compensation, and Defendants were able to compete unfairly against other limousine services companies that provided the requisite employee benefits.

13.     Under the initial ICA, Plaintiffs and other drivers were required to use Defendants' equipment, wear Defendants' prescribed "uniform," and meet other standards that Defendants set. Plaintiffs and other drivers were told and understood that they would receive assignments conditioned on their compliance with Defendants' rules, including their willingness to work within schedules Defendants set, and on their willingness to keep the vehicles in geographic locations that Defendants required and which benefited Defendants during the drivers' mandated schedules.

14.     To provide customers with around-the-clock coverage they marketed to consumers, Defendants generally scheduled Plaintiffs and other similarly situated drivers to work in twelve-hour (12) shifts, six days each week.

15.     Under the initial ICA, although Plaintiffs and other drivers purportedly leased from Defendants the limousines' they were supposedly driving as Defendants' independent contractors (Defendants even created purported vehicle lease forms), Plaintiffs and other drivers did not actually lease Defendants' limousines, did not pay a lease amount, and did not actually determine how and when the limousines (typically sedans and SUVs) could be used. Defendants told Plaintiffs and other drivers that they were not permitted to use Defendants' vehicles to service passengers that the drivers might identify independent of Defendants' dispatching services and Plaintiffs and other drivers understood that they would suffer (and on occasion did suffer) retaliation, by way of reduced dispatcher assignments, if they violated Defendants'

rules.  Additionally, Plaintiffs and other drivers were required to return the limousines

and the Defendants' other property, including cell phones and pagers (communication

devices for which Plaintiffs and other drivers were separately assessed a usage fee),

within twenty-four (24) hours of any ICA's termination.

16.    Initially, Plaintiffs and other drivers were told that "For the use of

CONTRACTOR'S SERVICES, the COMPANY shall pay the CONTRACTOR 50%

of the amount charged to COMPANY'S customer, exclusive of administrative fees

and taxes."  Plaintiffs and other drivers also were told that customers paid an 18% tip

(using a credit card), half of which would be paid to each driver.

17.    In fact, unbeknownst to Plaintiffs, Defendants were not paying Plaintiffs

even this promised amount.  Defendants and employees or agents under their control

routinely told Plaintiffs and other drivers that their passengers were charged

considerably less than passengers actually were charged, thereby allowing Defendants

to keep tens of thousands of dollars promised and owed to the drivers.  Defendants

were able to facilitate this deception by charging passengers' credit cards a higher

amount than the amount Defendants reported to the drivers when passengers called

into Defendants' company to reserve a limousine.  Defendants acted to prevent

drivers from seeing or otherwise from discovering customers' actual charges, and then

regularly and routinely reported, falsely, lower customer charges to the drivers on each

driver's bi-weekly pay statements.

18.    Defendants changed some of the language of the initial ICA in a revised

ICA that Defendants also deliberately and routinely left undated. The revised ICA explicitly required each driver to hold himself out to the public as an independent contractor doing business with the COMPANY and not as an employee of the COMPANY," and in the revised ICA the previously mandated dress code was termed "suggested." Although the revised ICA indicated that its term "shall commence in the effective date as indicated below and shall terminate in twelve (12) months from that date, at which time an additional Agreement will be negotiated between the parties[,]" the revised ICA indicated no effective date.

19. The revised ICA also modified the language concerning drivers' compensation, now stating that "For use of CONTRACTOR'S services, COMPANY shall pay CONTRACTOR 50% of the COMPANY'S then-current driver's rate sheet, exclusive of administrative fees, voucher fees, any other charges levied to the customer, fuel surcharges, and taxes." Although the language was different, Defendants told Plaintiffs and other similarly situated drivers that the new language was not intended to change their compensation. Defendants told Plaintiffs and other similarly situated drivers that driver's rate sheet conformed to what each driver's passenger was actually paying for each chauffeured trip and that each driver's percentage-based compensation was thus not changing in the revised ICA from what the drivers had previously been told they were actually receiving, *i.e.*, 50% of the fare rate that each customer paid and ½ the tip. In fact, because Defendants had been cheating drivers all along by withholding and not reporting portions of the fares and

gratuities they had been charging to passengers, consistent with Defendants'
representations to their drivers that the drivers' compensation was not intended to
change as a result of the revisions to the compensation language, driver compensation
did not appear to change after the ICA's revision and in reliance on Defendants'
representations and conduct, Plaintiffs and similarly situated drivers continued to
provide chauffeur services so Defendants' customers.

20.     Furthermore, Plaintiffs and other similarly situated drivers never were
provided a separate "driver's rate sheet" when they were presented with their so-called
"Independent Contractor Agreements" and, upon information and belief, no uniform
driver's rate sheet actually existed.  Drivers were told that the company was
compensating its drivers using fare rates that were based on market conditions and
Defendants even adjusted upward on at least one occasion, the rates, purportedly to
reflect a market survey that Defendants had conducted.  In reliance on Defendants'
representations that the drivers would be paid half of each fare charged to their
passengers, Plaintiffs and other similarly situated drivers agreed to work and did in
fact work and continue to work for Defendants.

21.     At all times while Plaintiffs were employed by Defendants as so-called
independent contractors, Defendants controlled all aspects of Plaintiffs' job duties
through threats and strictly enforced employment rules.

22.     Defendants hired Plaintiffs and, at all times, had the ability to discipline
Plaintiffs, fine Plaintiffs, fire Plaintiffs, and adjust Plaintiffs' schedule.

23. Defendants, at all times, supervised Plaintiffs' work duties and the job duties of all other drivers to make sure Plaintiffs' job performance and the job performance of all other drivers was of sufficient quality and to ensure that Defendants' limousines were continuously disbursed throughout the Washington, D.C. metropolitan area and thus ready and available on short notice to retrieve and transport new fares.

24. At all times while Plaintiffs were employed, Plaintiffs' and other drivers' pay and opportunity for wages was limited to the pay method and work schedules set exclusively by Defendants.

25. Defendants controlled all aspects of setting and enforcing Plaintiffs' and other drivers' work schedule.

26. Plaintiffs and other drivers did not share in the profits of Defendants.

27. At no time did Plaintiffs or other drivers make a financial investment in Defendants' company or any equipment belonging to Defendants.

28. To perform the work duties that Plaintiffs and other drivers performed for Defendants, Plaintiffs and other drivers did not have or need any required certificate, education, or specialized training.

29. At all times while Plaintiffs was employed, Defendants were in the business of operating a sedan and limo service and at all times Plaintiffs' and other drivers' job duties for Defendants were directly related to providing limo and sedan driving services for Defendants' customers.

30.    Upon information and belief, by 2011, Defendants became convinced that they could no longer successfully maintain to government regulatory, taxing and/or law enforcement officials that their drivers were independent contractors.  In about November 2011, Defendants forced Plaintiffs and other drivers Defendants employed to sign new employment agreements or face termination.  The purported compensation of the driver-employees changed from the 50% of the book rate for each trip that Defendants told the drivers they had been paid to 40%, and the drivers were told that as employees they also would keep all (100%) of the gratuity charge assessed to passengers.  But, even after finally and properly characterizing the drivers as employees, Defendants have continued to misrepresent to their drivers what passengers actually are charged, understating the actual charges, and thereby skimming not just from the 40% that the drivers were told they would be paid, but skimming from the drivers' gratuities, too.

31.    Additionally, even after Defendants began to characterize the drivers as employees, the remaining conditions of Plaintiffs' and other drivers' employment have not materially changed.  Drivers are still required to pay out of their own pockets for Defendants' business and operating expenses, including for fuel (notwithstanding that passengers are charged a fuel surcharge), for radio dispatching expenses, and for car washings.  Additionally, Plaintiffs and other similarly situated drivers receive no compensation for numerous other services they are required to provide to Defendants, including time spend on vehicle maintenance, time spent on vehicle

inspection and registration, and time spent traveling to locations to retrieve Defendants' vehicles.

## PLAINTIFFS ARE OWED SUBSTANTIAL DAMAGES UNDER THE FLSA

32.    At all times during the period of Plaintiffs' employment, Plaintiffs performed work duties or were contractually engaged to be waiting to perform work duties for at least seventy-two (72) hours per week, and for longer periods as job assignments extended beyond set schedules.  Furthermore, Plaintiffs and similarly situated drivers were not compensated for other time spent on behalf of their employer, including but not limited to time spent traveling to dispatched assignments, time spent washing, servicing and maintaining cars, time spent during licensing inspections, or time spent retrieving cars from delivery locations that included travel to Baltimore and to New Jersey.

33.    With regard to Plaintiffs duties for which Plaintiffs were contractually engaged to be waiting, individual Defendant Shafqat Chaudry, aka "Sunny" and employees or agents under Defendants' control personally instructed and demanded that, while Plaintiffs were awaiting calls from Defendants' dispatcher, it was Plaintiffs' strict work responsibility for Plaintiffs to remain at specific landmarks or locations and in specific geographic areas and Plaintiffs were required at all times during Plaintiffs' shifts to physically remain in or around Defendants' provided vehicle. Maintaining their fleet in various locations allowed Defendants to respond to last-minute reservations quickly, thereby ensuring that transportation jobs were not

forfeited to other limousine operators or to taxicab drivers.

34.     Defendants enforced that Plaintiffs remained at specific landmarks or in or around Plaintiffs' vehicle in or around specific geographic areas through a closely monitored GPS system on Plaintiffs' vehicle and/or on work phones for which Plaintiffs and other drivers were required to pay.

35.     Additionally, if Plaintiffs did not comply with Defendants' requirement that during their scheduled shits all drivers be readily available to shuttle customers in and around the Washington, D.C. metropolitan area, Plaintiffs would be punished through removal from Defendants' dispatcher's call list and thus receive no or substantially reduced income during a scheduled work period.

36.     Upon information and belief, Defendants' income primarily derived from their formal and informal limo and sedan service contractual relationships with specific hotels and large employers in the Metropolitan Washington, D.C. Area. Thus, Plaintiffs' remaining in or around their vehicle at specific landmarks or in or around specific geographic areas insured that Defendants could quickly provide limo and sedan services at all times during Plaintiffs' shift and Plaintiffs' immediate availability to perform such work duties was primarily for Defendants' benefit.

37.     Defendants' requirement that Plaintiffs remain in or around their sedan at specific landmarks and in specific geographic areas, and their willingness to punish disobedient drivers prevented Plaintiffs from going home or otherwise attending to personal errands during their shift.  Defendants continuously and stringently

instructed that Plaintiffs were on Defendants' time during their shift and must remain available to perform work duties for Defendants' benefit.

38.     During the period of Plaintiffs' employment, Plaintiff regularly and customarily worked about seventy-two (72) or more hours per week and Defendants suffered or permitted Plaintiffs to work about seventy-two (72) or more hours per week.

39.     Defendants had knowledge of all hours Plaintiffs worked because Defendants personally set Plaintiffs' work schedule and the work schedule of all other drivers working for Defendants as well as monitored Plaintiffs' GPS tracking and the tracking devices of all other drivers to ensure that Defendants had knowledge of all hours that Plaintiffs and each driver worked each day and week.

40.     At all times during Plaintiffs' employment, Defendants purported to pay Plaintiffs as "piece-rate" employees, initially in the amount of fifty percent (50%) of what Defendants allegedly charged customers per trip, not including tips, and after November 2011 in the amount of forty percent (40%) of what Defendants allegedly charged customers per trip—not including gratuity charges.

41.     Throughout Plaintiffs' employment, however, Plaintiffs did not receive all "piece-rate" wages as set forth above but rather received compensation in a substantially lower amount.

42.     In a typical week, Plaintiffs earned piece-rate wages in the amount ranging approximately six hundred fifty dollars ($650.00).

43.     Each week throughout Plaintiffs' employment, Defendants required Plaintiffs to pay for Defendants' work costs including gasoline and tolls, amounting weekly to approximately three hundred dollars ($300.00), and Defendants did not reimburse Plaintiffs for these amounts Plaintiffs paid.

44.     Each week throughout Plaintiffs' employment, Defendants also required Plaintiffs to pay for Defendants' dispatch communications system, charging Plaintiffs approximately $56.00 bi-weekly for radios and/or cell phones that Defendants used to communicate with their drivers and to dispatch drivers to various chauffeur assignments.

45.     The consequence of Defendants' failure and refusal to reimburse Plaintiffs for gasoline and tolls was that Plaintiffs' actual received compensation was actually reduced to, approximately, at least three hundred fifty dollars ($300.00) per week ($650.00 per week "piece-rate" – $300.00 for gas/tolls / $56.00 for radio = approximately $350.00).

46.     According to 29 C.F.R. § 778.112, where employees are paid a lump sum, the week's compensation must be converted to a "regular rate," equal to the total wages paid for the week divided by the total hours actually worked.  The regular rate is the necessary keystone for calculation wages due no matter how employees are paid. *Bay Ridge Operating Co. v. Aaron,* 334 U.S. 446 (1948); *Walling v. Youngerman-Reynolds Hardwood Co.,* 325 U.S. 419 (1945).

47.     The "regular rate" of pay means the actual rate of pay which the

employee is receiving no matter how high, and not the minimum rate set forth in the statute. *See Missel v. Overnight Motor Transp. Co.*, 126 F.2d 98, 106 (4th Cir. 1942). If the employee's hours vary from week to week, the cost per week to her employer will vary accordingly. *Id.* at 110; *see also Wilson v. New*, 243 U.S. 332, 361-62 (1917).

48.     There is nothing in the FLSA which prevents the average hourly rate from being computed separately each week. In fact, the FLSA contemplates workweek as the regular unit for computing the hourly rate. *Missel*, 126 F.2d at 110.

49.     At all times during Plaintiffs' employment, because Defendants paid Plaintiffs wages without regard for the number of hours Plaintiffs worked each week, Defendants paid Plaintiffs straight pay, at Plaintiffs' regular hourly rate, for all hours worked each week including overtime hours worked each week in excess of forty (40).

50.     Applying the calculation method as set forth in the C.F.R., Plaintiffs' regular rate of pay while in Defendants' employ was equal to approximately $4.86 per hour ($350.00 per week / 72 hours per week = $4.86 per hour).

51.     At no time during Plaintiffs' employment with Defendants did Plaintiffs perform work duties that would make Plaintiffs' exempt from the minimum wage compensation requirement of the FLSA.

52.     At all times during Plaintiffs' employment, Plaintiffs' regular rate of pay ($4.86 per hour) was less than the Federal Minimum Wage ($7.25 per hour).

53.     For all non-overtime hours worked each week, Plaintiffs are now owed the difference between their regular rate of pay and the Federal Minimum Wage, $2.39

per hour ($7.25 per hour - $4.86 per hour = $2.39 per hour).

54.    For each week that Plaintiffs worked, Plaintiffs are owed non-overtime minimum wages in the amount of $95.60 ($2.39 per hour x 40 non-overtime hours per week = $95.60).

55.    At no time during Plaintiffs' employment with Defendants did Plaintiffs perform work duties that would make Plaintiffs exempt from the overtime pay requirement of the FLSA.

56.    For all overtime hours worked each week in excess of forty (40), Plaintiffs are now owed the difference between Plaintiffs' regular rate of pay ($4.86 per hour) and one-and-one half (1½) times the Federal Minimum Wage, in the amount of $6.02 per overtime hour (($7.25 per hour x 1.5 = $10.88 per hour) - $4.86 = $6.02 per overtime hour).

57.    For each week that Plaintiffs worked, Plaintiffs are owed unpaid overtime wages in the amount of $192.64 ($6.02 per overtime hour x 32 overtime hours per week = $192.64).

58.    As a consequence of the foregoing, each week that Plaintiffs worked, Plaintiffs are entitled to unpaid minimum wage and overtime compensation in the amount of $297.46 per week ($95.60 + $192.64 = $288.24 per week).

59.    An employer who violates the FLSA minimum wage and overtime provisions are ordinarily "liable to the employee or employees affected in the amount of their unpaid minimum wages ... and in an additional equal amount as liquidated

19

damages." 29 U.S.C. § 216(b).

60.    The award of liquidated damages is mandatory unless "the employer shows to the satisfaction of the court that the act or omission giving rise [to the FLSA action] was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260.

61.    The FLSA operates to excuse liability for liquidated damages only where the employer demonstrates *both* good faith *and* reasonable grounds for believing that he was not acting in violation of FLSA. Thus, the employer must satisfy both prongs of a two-prong test in order to be relieved of liability for liquidated damages. Moreover, the Fourth Circuit has held that the test of the good faith requirement to excuse liability is an objective one and not a subjective one. *See Clifton D. Mayhew, Inc. v. Wirtz*, 413 F.2d 658, 661-62 (4th Cir. 1969).

62.    Here, Defendants' failure to pay Plaintiffs minimum wage compensation and overtime wages as required by Federal Law was not the product of good faith and Defendants had no reasonable grounds for believing their failure to pay Plaintiffs at the minimum wage rate or overtime compensation at the legal rate was in compliance with Federal law.

63.    Defendants cannot meet their burden of an affirmative showing to avoid the imposition of liquidated damages. As such, in addition to Plaintiffs' entitlement to unpaid minimum wage compensation and overtime wages, Plaintiffs are also entitled to liquidated damages in an equal amount.

## EQUITABLE TOLLING SHOULD APPLY FOR THE ENTIRE PERIOD OF PLAINTIFFS' EMPLOYMENT WITH DEFENDANTS

64.     At all times during the course of Plaintiffs' employment with Defendants, Defendants did not post or otherwise make visible or available in a conspicuous location at Defendants' place of business any poster or information that notified its drivers of the Federal Minimum Wage requirement.

65.     At all times during the course of Plaintiffs' employment with Defendants, Defendant did not post or otherwise make visible or available in a conspicuous location at Defendants' place of business any poster or information that notified its drivers of the Federal Overtime pay requirement.

66.     At all times during the course of Plaintiffs' employment with Defendants, Defendants did not post or otherwise make visible or available in a conspicuous location at Defendants' place of business any poster or information that notified its drivers of any enforcement remedies available to employees who are not paid by employers as required by Federal Law, including notification that the Department of Labor may recover back wages on behalf of employees or that underpaid employees have a private right of action to file a lawsuit against employers for nonpayment or underpayment of wages in violation of Federal Law.

67.     At all times during the course of Plaintiffs' employment with Defendants, Defendants did not post or otherwise make visible or available in a conspicuous location at Defendants' place of business any poster or information that notified its drivers of the fact

that Federal Law prohibits discriminating against or discharging workers who file a Complaint or participate in any proceeding to recover unpaid or underpaid wages under Federal Law.

68. At all times during Plaintiffs' employment, Defendants explicitly advised Plaintiffs that Plaintiffs were not entitled to be paid in accordance with the requirements of Federal Law and affirmatively misrepresented and deceived Plaintiffs, both as to the nature of Plaintiffs employment and as to the charges actually assessed for the limousine services that Plaintiffs were providing, intending to prevent Plaintiffs from discovering that they were being cheated and/or defrauded.

69. At all times during Plaintiffs' employment, Defendants verbally and physically intimidated Plaintiffs such that Plaintiffs were afraid to take any actions to enforce their rights to unpaid and underpaid wages and unreimbursed employer expenses under applicable law, and denied Plaintiffs access accurate records of charges and other information that would have permitted Plaintiffs through the exercise of due diligence to discover Defendants' illegal misconduct.

70. In consideration of the foregoing, it is proper to toll Plaintiffs' FLSA overtime and minimum wage claims, and their State law claims, to include the entirety of Plaintiffs' employment with Defendants.

## COLLECTIVE ACTION ALLEGATIONS

71. Plaintiffs are pursuing this action as an FLSA collective action on behalf of themselves and all other similarly situated individuals who performed work duties as sedan

and SUV limousine drivers for Defendants.

72.     In the present case, the questions of law or fact common to the members of the class predominate over any questions affecting only individual class members. The essence of this entire case is that the Plaintiffs and other similarly situated individuals were not paid wages in compliance with the minimum wage and overtime compensation requirements of the FLSA.

73.     Common to Plaintiffs and all class members is that each individual received wages and overtime compensation from Defendants at a rate less than what is required by Federal Law.

74.     In the present case, the number of class members is believed to exceed fifty (50) current and former limo and sedan drivers.

75.     All class members are readily identifiable from information and records, on information and belief, in the possession and control of Defendants.

## CAUSES OF ACTION

### COUNT I
**Violation of Federal Fair Labor Standards Act
(Minimum Wage)**

76.     Plaintiff re-alleges and reasserts each and every allegation set forth in Paragraphs 1-75 above as if each were set forth herein.

77.     Section 206(a)(1) of the FLSA provides that no employer shall employ any employee for an hourly wage of less than the Federal Minimum Wage, $7.25 per hour.

78.     At all times, Plaintiffs were "employees" covered by the FLSA, 29 U.S.C. §

206(a)(1).

79.     At all times, both Defendants were Plaintiffs' "employers" under the FLSA.

80.     Defendants, as Plaintiffs' employers, were obligated to compensate Plaintiffs for all non-overtime hours worked at an hourly rate not less than the Federal Minimum Wage.

81.     For a substantial portion of Plaintiffs' employment, Defendants paid Plaintiffs wages less than the Federal Minimum Wage.

82.     At all times during Plaintiffs' employment, Plaintiffs also received "tips" or "gratuities" from Defendants' customers to supplement Plaintiffs' regular hourly rate.

83.     "The FLSA allows employers to pay less than minimum wage to employees who receive tips....The mechanism it creates to allow employers to pay less than minimum wage is the "tip credit." *See* 29 U.S.C. § 203(m)).

84.     Employers may only take a tip credit if certain requirements are met. See 29 U.S.C. § 203(m). Namely, (1) the employer must give the employee proper notice of taking a tip credit; (2) the employee must retain all of his or her tips except for those lawfully shared with other employees; and (3) the employee, through her tips, must make up the difference between the tipped minimum wage and full minimum wage—if she does not, the employer must pay the employee the difference in wages. *See id.;* 29 C.F.R. § 531.59. (emphasis supplied).

85.     Here, Defendants did not give Plaintiffs or other drivers any notice that Defendants were taking or intended to invoke the "tip credit."

86.     At all times during Plaintiffs' employment, Defendants took, and kept for their own use, a substantial portion (typically more than half) of Plaintiffs' tips.

87.     At no times during Plaintiffs' employment did Plaintiffs or any other driver retain all of their tips received from Defendants' customers.

88.     Because the three (3) "tip credit" requirements were met by Defendants, Defendants cannot avail itself of the FLSA's "tip credit" in calculating back wages owed to Plaintiffs and other drivers.

89.     Defendants have failed and refused to compensate Plaintiffs and other drivers at an hourly rate at least equal to the Federal Minimum Wage as required by the FLSA for numerous hours worked.

90.     Defendants' failure and refusal to pay compensation to Plaintiffs as required by the FLSA was willful and intentional, and not in good faith.

WHEREFORE, Defendants are liable, jointly and severally, to Plaintiffs and all others similarly situated who have joined in this suit for unpaid minimum wages in such amounts as are proven at trial, plus an equal amount in liquidated damages, interest (both pre- and post-judgment), attorney's fees, the costs of this action, and any other and further relief this Court deems appropriate.

## COUNT II
### Violation of Federal Fair Labor Standards Act
### (Overtime)

91.     Plaintiff realleges and reasserts each and every allegation set forth in Paragraphs 1-90 above, as if each were set forth herein.

92.     Section 207(a)(1) of the FLSA provides that no employer shall employ any of its employees for a workweek longer than forty (40) hours unless such employee receives compensation for her employment in excess of the hours above specified at a rate not less than the <u>higher of</u> one-and-one-half (1½) times the regular rate at which she is employed or one-and-one half times the Federal Minimum Wage.[1]

93.     At all times, Plaintiffs were "employees" covered by the FLSA, 29 U.S.C. § 207(a)(1), and both Defendants were Plaintiffs' "employers" under FLSA, 29 U.S.C. § 207(a)(2).

94.     Defendants, as Plaintiffs' and other drivers' employers, were obligated to compensate Plaintiffs and other drivers at the overtime rate of one-and-one-half (1½) times <u>the higher of</u> Plaintiffs' and other drivers' regular rate of pay or one-and-one half (1½) times the Federal Minimum Wage for all hours worked per week in excess of forty (40).

95.     As set forth above, while in Defendants' employ, Plaintiffs and other drivers typically and customarily worked about thirty-two (32) or more hours of overtime, each week.

96.     As set forth above, Defendants have failed and refused to compensate Plaintiffs and other drivers properly, and as required by the FLSA, for all overtime hours worked each week in excess of forty (40).

---

[1] If the Court is persuaded that Plaintiffs received "services charges" sufficient to satisfy Defendants' Minimum Wage obligation (Plaintiffs emphatically reject this position as legally inapposite), Plaintiffs' overtime rate is properly calculated by (1) adding all remuneration Plaintiffs received each week, including "service charges"; (2) dividing this amount by the total number of hours Plaintiffs worked each week (creating Plaintiffs' "regular hourly rate"; and (3) multiplying Plaintiffs' regular rate by 1.5. *See* 29 C.F.R. § 778.112.

97.     Defendants' failure and refusal to pay Plaintiffs and other drivers as required by the FLSA for overtime hours worked each week was willful and intentional, and was not in good faith.

WHEREFORE, Defendants are liable, jointly and severally, to Plaintiffs and all other similarly situated drivers who join this action under Count II for all unpaid overtime wages in such amounts as are proven at trial, plus an equal amount in liquidated damages, interest (both pre- and post- judgment), reasonable attorney's fees, the costs of this action, and any other and further relief this Court deems appropriate.

## COUNT III
### (Fraud)

98.     Plaintiffs reallege and reassert each and every allegation set forth in Paragraphs 1-97 above, as if each were set forth herein.

99.     During all times relevant here, Defendants have desired not to pay Plaintiffs even the amounts that they had promised to pay Plaintiffs for the chauffeur services Plaintiffs were providing, and have desired not to reimburse Plaintiffs for amounts incurred on Defendants' behalf.

100.    To avoid paying promised and owed amounts while inducing Plaintiffs and similarly situated drivers to continue working for Defendants, Defendants concocted a scheme whereby they would intentionally mischaracterize the nature of each driver's employment relationship, would report to Plaintiffs and other similarly situated drivers a different amount than the amount actually charged to customers for the provision of

limousine services, and would report that the amounts paid to Plaintiffs and the other

drivers were determined based on actual and competitive market rates.

101.   Defendants told Plaintiffs and other drivers that their compensation was based

a percentage of the market rate for each trip, which rate customers were allegedly paying, but

Defendants knew that their representations to Plaintiffs and other similarly situated drivers

were not true.

102.   In falsely reporting to the drivers a different amount than the amount actually

collected from passengers, Defendants agreed and conspired with other employees or other

persons otherwise engaged to perform payroll/bookkeeping services to ensure that amounts

reported to Plaintiffs and other drivers as actual customer charges was, in fact, uniform

(even when fares were not) and consistently lower that the amounts Defendants actually

charged to customers.

103.   Plaintiffs and other similarly situated drivers reasonably relied on the

statements issued by Defendants and, accordingly, did not contest the inaccuracy of their

compensation or otherwise pursue legal recourse, and, instead, continued to provide

chauffeur services for Defendants.

104.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

suffered damages, including but not limited to underpayment of owed compensation and

improper payment of Defendants' own business expenses.

105.   The actions of Defendants in deliberately committing fraud authorize the

imposition of punitive damages, pursuant to the provisions of Virginia law, in that they show

willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequence.

WHEREFORE, Defendants are liable, jointly and severally, to Plaintiffs and all other similarly situated drivers who join this action under Count III for damages in such amounts as are proven at trial, as well as interest (both pre- and post- judgment), reasonable attorneys' fees in accordance with the Virginia Supreme Court's holding in *Prospect Dev. Co. v. Bershader*, 258 Va. 75, 92-93, 515 S.E.2d 291, 300-301 (1999), the costs of this action, punitive damages, and any other and further relief this Court deems appropriate.

## COUNT IV
### (Constructive Fraud)

106.   Plaintiffs reallege and reassert each and every allegation set forth in Paragraphs 1-105 above, as if each were set forth herein.

107.   If the false representations of material facts by Defendants were made innocently r negligently, Plaintiffs were nevertheless injured as a direct and proximate result of their reliance on representations that were false, and demands damages for constructive fraud.

WHEREFORE, Defendants are liable, jointly and severally, to Plaintiffs and all other similarly situated drivers who join this action under Count IV for all damages in such amounts as are proven at trial, as well as interest (both pre- and post- judgment), reasonable attorneys' fees in accordance with the Virginia Supreme Court's holding in *Prospect Dev. Co. v. Bershader*, 258 Va. 75, 92-93, 515 S.E.2d 291, 300-301 (1999), the costs of this action, and any

other and further relief this Court deems appropriate.

## COUNT V
### (Common Law Conspiracy)

108.   Plaintiffs reallege and reassert each and every allegation set forth in Paragraphs 1-107 above, as if each were set forth herein

109.   In undertaking the acts described in this Complaint, Defendants combined and/or concerted together with one another, as well as with other persons and entities, including payroll and bookkeeping personnel, to accomplish an unlawful action for the purpose of injuring Plaintiffs.

110.   Defendants' actions in furtherance of this conspiracy were taken intentionally, purposefully, and without lawful justification.

111.   Defendants' actions in furtherance of this conspiracy were taken to maliciously injure Plaintiffs.

112.   As a direct and proximate result of Defendants' unlawful conduct deliberately committing fraud authorize the imposition of punitive damages, pursuant to the provisions of Virginia law, in that they show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequence.

113.   The actions of Defendants in deliberately conspiring to injure Plaintiffs authorize the imposition of punitive damages, pursuant to the provisions of Virginia law, in that they show willful misconduct, malice, fraud, wantonness, oppression, or that entire want

of care which would raise the presumption of conscious indifference to consequence.

WHEREFORE, Defendants are liable, jointly and severally, to Plaintiffs and all other similarly situated drivers who join this action under Count V for damages in such amounts as are proven at trial, as well as interest (both pre- and post- judgment), reasonable attorney's fees, the costs of this action, punitive damages, and any other and further relief this Court deems appropriate.

### COUNT VI
### (Breach of Contract)

114.   Plaintiffs reallege and reassert each and every allegation set forth in Paragraphs 1-113 above, as if each were set forth herein.

115.   Defendants promised Plaintiffs and other similarly situated drivers that in return for the services they agreed to render to Defendants, Defendants would pay drivers specified percentages of the amounts charged to customers, and specified percentages of the gratuities/tips customers also paid.

116.   Plaintiffs were at all times in compliance with and not in breach of their contractual agreements relating to employment with and compensation from Defendants.

117.   Throughout the course of Plaintiffs' employment with Defendants, Defendants failed to pay the promised compensation; instead, Defendants misrepresented to Plaintiffs and other drivers the amounts customers actually paid for the chauffeur services drivers regularly provided.

118.   As a direct and proximate cause of Defendants' breaches of contracts with Plaintiffs, Plaintiffs have been damaged in an amount to be determined at trial from records under Defendants' custody and control.

WHEREFORE, Defendants are liable, jointly and severally, to Plaintiffs and all other similarly situated drivers who join this action under Count VI for damages in such amounts as are proven at trial, costs, and any other and further relief this Court deems appropriate.

## COUNT VII
### (Unjust Enrichment)

119.   Plaintiffs reallege and reassert each and every allegation set forth in Paragraphs 1-118 above, as if each were set forth herein.

120.   Plaintiffs and other similarly situated drivers provided chauffeured driver services to Defendants pursuant to a sham, unconscionable "Independent Contractor Transportation Agreement" which were at all times mentioned herein non-negotiable contracts of adhesion, drafted or imposed exclusively by Defendants and/or their legal counsel, exclusively for Defendants' benefit and containing multiple unconscionable provisions, including but not limited to:  the provisions misclassifying the drivers as "independent contractors" while at all times reserving to Defendants the right to control the method and manner of work performance of the drivers; the provisions requiring the drivers to pay an expenses of vehicles and other equipment they are required to use for Defendants' benefit; the provisions refusing to provide workers compensation insurance or coverage for the drivers as required by law; and any provisions permitting compensating drivers by paying

them less than the expenses they incur and far below the minimum wages once those expenses are excluded from such compensation.

121.   Defendants receive substantial benefits from Plaintiffs and the Unjust Enrichment Plaintiffs, who provide chauffeur services for Defendants' customers at Defendants' direction.  Defendants nonetheless retain and are unjustly enrichment by the amounts they retain from their customers for the chauffeur services provided by Plaintiffs and the members of the plaintiff classes, without fully reimbursing them for the expenses of providing such service and without accurately compensating them even under the formula by which Defendants promised to abide.

122.   Defendants charge their customers a fuel surcharge for fuel paid for by Plaintiffs and the Unjust Enrichment Plaintiffs and receive substantial payments from customers for such fuel surcharges.  Defendants do not purchase the fuel used by Plaintiffs and the Unjust Enrichment Plaintiffs for the chauffeur services they make and which are subject to the fuel surcharge billed to the customers.  Upon information and belief, Defendants reimbursed Plaintiffs and similarly situated drivers no more than 25% of such fuel surcharges, and Defendants are unjustly enriched by, at a minimum, 75% of such surcharges which they levied and have retained despite not having paid for much, if any of the fuel Plaintiffs and similarly situated drivers have used, and continue to use.

WHEREFORE, Defendants are liable, jointly and severally, to Plaintiffs and all other similarly situated individuals that join this action under Count VII for all their vehicle and related driving expenses, for all Defendants' retained fuel surcharges

received from customers for deliveries made by Plaintiffs, for that portion of actual

trip fees charged to customers but not properly reported and paid to drivers, and for

trip fees withheld from drivers, plus interest (both pre- and post- judgment),

reasonable attorney's fees, the costs of this action, and any other and further relief this

Court deems appropriate.

## JURY DEMAND

Plaintiffs respectfully request a trial by jury on all issues so triable.

Respectfully submitted,

_/S/_

Gregg C. Greenberg, VA Bar No. 79610
The Zipin Law Firm, LLC
8403 Colesville Road, Suite 610
Silver Spring, Maryland 20910
301-587-9373 (ph) / 301-587-9397 (fax)
Email:  ggreenberg@zipinlaw.com

*Counsel for Plaintiffs*